The District Court's non-infringement analysis was fundamentally flawed in several significant ways and this Court should reverse it. The key infringement issue regarded whether there was a stabilizing code on the defendant's fees and the District Court defined that as meaning a layer of materials. However, permeating throughout the District Court's non-infringement decision were critical findings that were directly contrary to the Court's claim construction of that term. The Court erroneously relied on how defendant's products were made despite saying several times that the process was irrelevant to infringement. The District Court repeatedly relied on the fact that Warner Chilcott's expert could not explain how the in-situ stabilizing layer was formed. Irrelevance is a rather strong word, isn't it? I mean, while this isn't a method claim, you could certainly gain insight as to the structure and the makeup of this pill by knowing how it's made. So, wouldn't there be relevance? That's a broad standard, remember. Well, I think the issue here, Your Honor, is that knowing the ingredients in it are important to doing the analysis. And from that point of view, having the list of ingredients is important. But the bottom line question here is whether there's a stabilizing coat or not in the defendant's beads. And so, if I had a process where they had a bead and then they applied a stabilizing coat and then they applied a coat that ensures it makes it to the small intestine, that would tell me we had infringement probably, wouldn't it? And then you wouldn't be telling me the method's irrelevant. Your Honor, in that hypothetical, you're correct. Well, then why isn't it relevant for the district judge to inquire as to what the method is? If the method had been what we just said it is, you'd be happy. Right, but Your Honor, you're just arguing that you didn't get the results you wanted. No, actually. And you're calling it irrelevant for that reason. Judge Rader, I'm not. I'm calling it irrelevant because the district court called it irrelevant. The district court said in his claim construction decision and during trial how the process in which the tablets were made. Well, you know, we can, I hate to do this, but we quibble with, that's quibbling with words. We understand it's irrelevant for some purposes, it's relevant for others. But it isn't an attack on the substance of his opinion that he used that word at one point, is it? Because we both recognize that it could be relevant for some purposes, not for others. Well, for the purposes of this case, it's irrelevant because we know there was no dispute that there was no stabilizing coat. That was never our theory. There was no directly applied stabilizing coat. Our theory was always that there was. Okay, well, so. But for this, for this. That's certainly not a reversible error. Why don't you go to something else? Okay, well, rather than, Your Honor, in addition, we think that the district court made other fundamental errors with regard to claim construction. The third one is that Milan's expert relied on a construction that was inconsistent with the district court's construction. Milan's expert, Dr. Buckton, said that the stabilizing coat had to be a perfect layer without any gaps. And the district court had said in its claim construction decision that that was not required. In addition, when you go to the actual infringement analysis. How is it reversible error if the expert said that, when the district court never said it? Well, the district court specifically relied on the testimony of Dr. Buckton in its non-infringement analysis as to what he would expect to see. He relied on Dr. Buckton's analysis. He was the only expert from, from Milan who provided any non-infringement opinions. And the district court only relied on his analysis in terms of what he expected to see. So I think it is reversible error because the district court did not apply the claims as he construed it. And in terms of the actual non-infringement analysis, I'll start with Milan and then talk about impacts. For Milan, the district court essentially relied on conclusory opinions of Milan's experts regarding the testing done by Dr. Davies. So the key issue, one of the key issues here is whether or not Dr. Davies saw a stabilizing coat in Milan's beads. And he saw that coat prior to doing any humidity treatment testing. But isn't that exactly what district judges have the authority to do, is to consider the testimony of both experts and then weigh them and balance them and reach conclusions, and aren't we supposed to defer to those determinations? Your Honor, here, Judge O'Malley, here, the district court, it's interesting because in the district court's decision on validity, he specifically rejected validity contentions because the defendant didn't provide a single test, cite a single piece of data, or point to any, any reference. And that's exactly what happened with Milan's experts. With regard to the humidity treatment, the only evidence that the district court points to is Milan's argument that either the bead, that the darkening was caused by an amorphous API or density differences. There's no data, no testing, no literature to support that. Wait, but wasn't there a burden to somehow prove why there were some darkening? It was your burden to establish, in fact, that there was infringement. And what the district court said is that you didn't satisfy that burden because the test, which had never been used for any other purpose outside of litigation, wasn't credible. But the district court ignored the testimony from Dr. Elder, who was Milan's microscopy expert. Dr. Elder was a primary witness for Milan on issues of the humidity testing. Dr. Elder effectively confirmed every single basis for Dr. Davies' use of humidity testing. Well, that's not true. He specifically said that Dr. Davies' test wasn't a good test, and he ran the same test and said, I don't see what he sees. Well, I, you know, Judge Dyke, I think what Dr. Elder said is that he agreed with Dr. Davies. He agreed on some points, but he basically agreed that Dr. Davies' test didn't show what it purported to show. Well, ultimately, what the district court said is that there were four facts that were strung together by Dr. Davies that the district court called were attenuated. In Milan's responsive brief, they don't dispute that the district court clearly erred in saying those, three of those four facts were attenuated. The last fact has to be. But isn't it true Dr. Elder ran the humidity test? You may take issue with that, but he purported to run the humidity test. He testified that he didn't see what Dr. Davies saw in the Dr. Davies' test. It wasn't a good test, right? Well, actually, Dr. Elder, on cross-examination, agreed that there was even darkening in his samples. Darkening, but not of a layer. Well, he saw the darkening. Those images, which are in the record, are very. He said it wasn't a layer, right? He said it wasn't a layer, but the question was that the only question that the district court addressed with Milan on infringement was whether the layer was povidone or not. If you look at the district court's decision very closely, he never discusses the issue. He assumes that there's a layer and says, but the darkness isn't necessarily povidone. He says it's not necessarily povidone based on Milan's expert's testimony regarding the amorphous API and the density differences. What would you say to us about the more scientifically reliable Raymond and Tafsim's tests? Well, I think that the Raman test and Tafsim's were known, but just because a test is known doesn't mean it's going to be reliable for that purpose. And what I would say is that if Dr. Davies, I assert that Dr. Davies' testing shows that based on undisputed facts, there was a layer of materials, because the district court found that in the preliminary injunction phase, and that in fact the darkness... Even if we assumed that were the case, we'd have two tests on the other side which would be sufficient evidence by a long shot to uphold what the district court did, wouldn't it? No, I disagree. The reason I disagree... And of course, we're not in that situation. Your test isn't even on the table because it got rejected by the district judge. Well, actually, your honor, the issues on rejecting that test and infringement, there's a lot of overlap here. But to address my question, even if your test were completely on the table, wouldn't we have adequate evidence on this record to uphold the district court's... I don't believe so, your honor. Either there's a layer or there's not. And there's two tests that says there is highly confirmed by scientific evidence and there's one not, assuming that that one says there is. Wouldn't we uphold this district court's... No, your honor. Once there's a test showing there's a layer, either the layer exists or not. If one test shows that there's a layer, as a matter of logic, the fact that you... We are not going to perform the test here at the appellate level and determine whether there's a layer or not. We are going to rely on a record. The record says two tests favor that there is no layer. One, taking your best case, says there is. Wouldn't we affirm the district court? No, your honor, because once the test we run shows that there's either a layer or not, once the test shows that there's a layer, another test, it doesn't show the absence of a layer. It simply shows that that test is unable to detect the layer. That's the difference. Once we prove that there's a layer, if Dr. Davey's testing proves... Well, that brings us back to the question of whether the darkening is povidone or not. No. It brings us to the fact that you haven't addressed the Raman or the Tofsin's test at all, which are reliable and are in the record as something we can review, whereas your tests were rejected by the district judge. Well, obviously, your honor, you know what our point of view is. With regard to the Raman testing, for example, there's no representative data in the Raman testing. Dr. Everall tested less than 5% of a bead. That's not representative. He could have been testing at a gap. He could have easily... How many places did he test? Sixteen? Well, may I address that? It's pretty... Sixteen places on a bead, that may be 5%. That's pretty representative. He didn't test 16 places on one bead. He did six single-point tests, one little dot on one bead. He did three single-point tests on another bead. He did two line scans, which are one thin... less than the width of your hair. He did one line scan on, I believe it's three, and he did two line scans on another bead. But Dr. Davies performed these same tests and also did not find any evidence of a layer. Isn't that correct? Dr. Davies was never looking for a povidone layer with those tests, Judge O'Malley. He specifically testified that wasn't the purpose of those tests. Yes, he ran the test, but at the time, when he opened up the bead, he didn't know what he was going to find, and he did run Raman testing, but he didn't run it thinking he would find a povidone layer. He wasn't testing for povidone, which gets back to my point, Judge Rader, which is that, you know, you can run many different tests, but you may not ever be able to find something if a test doesn't show it. May I quickly just skip to impacts? I know I'm basically already out of my 12 minutes. I'll just be very, very brief. The evidence is undisputed that Dr. Davies used his acetone wash and removed HP50 from impacts as bead. It's undisputed. The outer layer was, two-thirds of the outer layer was removed. That two-thirds include HP50. His wash removed it, and he ran the wash not once, not twice, but four separate times, and every time he got the same amount of outer layer removed. The district court's key finding that was clearly erroneous is that he, the district court said that HP50 was only partially soluble in the acetone and water wash, but that has to be wrong. If it was correct, then when Dr. Davies ran the wash once, maybe he would have removed a third of the outer layer. If he ran it twice, maybe he would have removed a half. If he ran it four times, he may have removed two-thirds, but that's not what happened. No matter how long he ran it, he got the same result. He revealed a stabilizing coat that was a third of the width of the outer layer, and there's no testing data or literature on the record from impacts to refute that testing. But the trial court made findings of facts that specifically refuted that, disagreed with that, didn't it? Both the trial court's findings of facts with impacts are, many of the findings for both Myelin and Impact, neither one of the defendants tried to actually support it, you know. They effectively agreed that we showed clear error. The partial solubility issue, there's no doubt, Judge O'Malley, that the HP50 was removed using the acetone wash, and the defendants provide nothing in response to that, no data. They didn't try to run the wash six times. They didn't try to run the wash using a different acetone and water wash. They didn't try to run the wash using a different stirring method. They have no data. They just have their experts getting up there and say, well, I disagree, and that should be good enough. I don't think that meets the requirement for shown evidence on the record. In fact, this court has said, when a district court doesn't rely, relies on conclusory expert opinions, it can be clear error. I noticed you didn't mention migration, which is an independent plan for non-infringement, and you yourself asked for an interpretation of the claim language, which required preventing migration, and you didn't put any evidence of preventing migration. Well, I would disagree that we did put in evidence of migration. We put in testimony from both sides' experts who say that if the layer exists, it will prevent the migration of core materials. Well, of course, Your Honor, if it exists. If it doesn't exist, and we lose on that basis, the migration issue isn't really relevant, and I agree with that, please. But if the layer exists, Dr. Kibbe said if it exists, it'll inhibit core materials. Dr. Davies said the same thing, and in fact, both Dr. Buckton and Dr. Davies agreed that the dissolution stability data that we had were surrogates for the migration element, and the district court erred by saying that the only reason that we had to prove that the reason for the inhibition, for the stability, was the stabilizer code. But I don't think... He was responding to your argument, not creating a new requirement. I'm sorry? He was responding to an argument that you were making. He wasn't creating a new requirement. I think in attempting to respond to our argument, he effectively created a new limitation of the claim by requiring us to show that it would be the reason for the stability of the tablet, and I don't believe the patent specification supports that reading. Thank you, Mr. Condi. Thank you. We'll restore your three minutes of rebuttal time. Would you give Mr. Schatzer the extra three minutes? No, excuse me. Mr. Schatzer's the second argument. Give Mr. Weisblatt the extra three minutes. So you'll have ten minutes if you need to use it, Mr. Weisblatt. Thank you, Your Honor, and good afternoon. This was not a closed case. The district court carefully crafted a 50-page opinion about non-infringement. He sat through a seven-day bench trial. He found multiple independent reasons why impacts did not infringe. He excluded the acetone wash test under Dauber. I got the impression from the first argument that we were aware of that, right? Yes, Your Honor, but I think what's important is these independent reasons, as Judge O'Malley pointed out, they all stand separately. The district court would have had to commit error in each one of these independent reasons for this court to reverse, and the opinion has extensive findings of fact and extensive credibility evaluations. And I want to go back to a point that was made. Every single test that was done by reliable, scientifically validated analytical methods, whether done by the plaintiff's expert or by impacts' expert, on unwashed, unauthored impact seeds, came up with the same answer, no infringement. How do you respond, though, to the argument that essentially what they're saying is that just because they don't see a layer there doesn't mean that it affirmatively disproves the existence of the layer? In other words, I think it's sort of the argument that the absence of evidence is not the same thing as evidence of absence. For those analytical tests, there was agreement among the experts that those tests should have been able to find a four to six micron stabilizer in immediate layer if it was there. Judge Martini found impacts' experts to be credible, that their testing was reliable, that their procedures were pristine, and so, yes, here we do have evidence of the negative. Judge Martini repeatedly found, if it was there, the tests would have found it. And we have to remember that when you... Is that what he said or did he just say that those tests would be the ones that people most normally or most likely would use to look for it? No, he actually, for the top SIMs and the ATR, FTIR, he actually found that if the four to six micron existed, for example, Dr. Sommer's ATR, FTIR data consistently and overwhelmingly reflect the absence of a four to six micron stabilizing coat layer. That's on A43 of his opinion. When you get to the top SIMs test, Judge Martini finds specifically at A44, if there were a four to six micron layer of talc and other materials, the top SIMs test would have detected it, including pointing out that the plaintiff's expert actually had a publication that mentioned that top SIMs readily detects talc. And Judge Martini went on, the data from Dr. Sodi, impacts' experts, consistently and overwhelmingly reflects the absence of a four to six micron layer in impacts' product. And I'd like to use that as a segue to some of the language that Judge Martini chose to use. Do you think we haven't read it? I know you've read it, Your Honor. I just want to... Then you probably don't need to read it again, do you? Certainly. And I want to go back to one thing that was said earlier, and that was it is undisputed that the acetone wash test removed what's called HP50. That was disputed from the day the trial started to the day the trial ended. We demonstrated, in fact, and the judge made extensive factual findings that even if one considers the test that he excluded under Daubert, it doesn't provide support for the infringement case. In other words, even after Judge Martini examined the results of the acetone washing test, the scale of infringement was at equipose. They didn't even prove a preponderance of the evidence with the acetone washing test. And he goes through chapter and verse why he found that was true. The second point was that it's undisputed that two-thirds of the outer layer was removed.  And what Judge Martini found, in essence, that what was left was a remnant of the outer delayed release coating. Extensive fact finding in that area. Judge Martini found impacts as experts credible. He found the plaintiff's expert not credible. He found the test reliable. An independent reason, as you pointed out, Judge Dyke, is the so that limitation in the claim. The drafters of this claim chose to use the words so that. They did not choose the words wherein said composition and then continued with the claim. They put the cause and effect words into that claim. And Judge Martini appropriately construed that claim and applied it.  Because the plaintiffs were relying on if there's a coat, that's where the stability comes from. And Judge Martini rejected that out of hand and found it was, again, a proof failure. And so one of the, in addition to the Daubert decision, we impacts, we are cross-appellant because of our claim that this is an extraordinary and rare exceptional case. When one reads Judge Martini's opinion, it becomes readily apparent that the plaintiffs pursued this case after it was manifestly unreasonable to do so. Every test that plaintiff's expert ran until two weeks. Defendants presented no evidence of bad faith. That's reading from the opinion that I didn't want you to read from. Yes, Your Honor. But what Judge Martini didn't explain is in that very simple finding, did he examine the notion that we pressed that they unreasonably persisted in this case. And that under the precedent of this court, when it's examining the extraordinary situation where there's an exceptional case, a litigant that pursues a case in an unjustified manner and unreasonably persists in a case after a rational litigant would have understood there was not infringement, that is a viable substitute if not bad faith. And that's where the only part of this decision that we differ with Judge Martini is that we believe... Isn't the problem that you basically made this argument in passing to Judge Martini? I mean, clearly, you never mentioned the word litigation misconduct. You didn't rely on the vexatiousness. You relied on the other prong, that it was objectively unreasonable for them to pursue this litigation. Therefore, he had to find both objective unreasonableness and subjective bad faith. Yes, Your Honor. And what is missing from the opinion is the explanation of, if he didn't find bad faith, did he weigh the appropriate metrics, if you will, of the behavior of the plaintiff? Does he state the test correctly? Yes, he does, Your Honor. Doesn't that suggest he applied it? You're so complimentary of him every place else. Did he just suddenly quit being a judge when he got to this test? No, Your Honor, it's a very difficult area. The precedent says, even if the court below states the appropriate test, if there aren't enough factual findings for this court to examine, for this court to evaluate... But he gave us 50 pages, which shows that he's grappling with myriad issues and expert witnesses on each side of four or five different tests. And don't you think he has a pretty good idea of whether or not this was baseless? Your Honor, yes, I believe he does. But the problem is... He never said it was baseless, right? He did not. But that's the issue is, is the one sentence he wrote enough? Where in the record did you give him evidence of subjective bad faith? I mean, you're criticizing him for not doing something. What did you... It seems that you didn't do much either. You didn't just give one paragraph. Excuse me. Well, yes, but when we demonstrated that the only evidence of infringement brought into the courtroom positively by the plaintiff ought to be excluded by Daubert, under the Daubert rule, there are cases where that alone... And Mark actually specifically said that that would almost never, standing alone, be enough. But here we don't have standing alone, Your Honor. We now have a litigant that's come to this court and pushed evidence that was excluded because as a discovery protective order violation. Well, that's different. That's a question of whether you want this court to give you a cease. That has nothing to do with what happened below. But, Your Honor, we believe that that is representative of the length to which... But on that issue, that footnote 41 was excluded because it's a discovery sanction. My understanding is they weren't relying on footnote 41 as such. They may have been relying on the same information that was in footnote 41, right? Before this court, they heavily relied on what's in footnote 41, and that was our difficulty in our paper. But I thought that wasn't the source of what they were relying on. I thought they were relying on oral testimony before the district court rather than the footnote in the expert report. Am I mistaken about that? The oral testimony that was injected into the trial is, in effect, the same as footnote 41. No, but it may be the same, but the sanctions order was addressed to footnote 41, not to the oral testimony. Yes, but in the trial, never did the plaintiff seek to use the information derived from the Mylan confidential information against impacts. It was totally, in a compartment, just Mylan. Footnote 41 was excluded because what the plaintiff wanted to do is use that information, fair game against Mylan, wanted to use that information against impacts, and that's what was excluded as a discovery sanction. You're into Mr. Schatzer's time. Then I will be done. Can you decrease Mr. Schatzer's time by a minute and a half, Reggie? That'll do, that's good. Larry Schatzer for Mylan, Your Honor. As with impacts, the district court was very clear about the strength of the evidence. The court said the evidence overwhelmingly indicates there's no stabilizing code in Mylan's ANDA product. Going to Judge O'Malley's question to Mr. Weissblatt, at page 822 of the opinion, the district court said if there was a stabilizing code in the Mylan ANDA product, the Raman test would have found it. The judge said at page 828 of his opinion that if there was a stabilizing code in the Mylan ANDA product, that the toxin test would have found it. So to win here, the appellants have to show that the judge abused his discretion in not allowing the humidity test into evidence. That even if it is allowed into evidence, that rather than the evidence being overwhelming, it's in fact clear error. On top of that, they would have to find that the judge's finding that Dr. Davies, the appellant's expert, was not credible is clear error, even though the Supreme Court in this court have said that a judge's credibility determination can virtually never be clear error. So all of those are the hurdles they have to clear. They haven't come close to clearing them. It's very obvious that that's the case. I want to briefly respond to a couple of points that Mr. Conde made. The district court did not say the layer had to be perfect and rely on Mylan's expert who allegedly said that the district court said at page 825 of its opinion, while plans are correct that data showing some core material at the surface of the bead is not inconsistent with the presence of stabilizing code, data showing a high concentration of core materials around the entire surface of the uncoated bead suggests there is not a layer of materials between each of the core elements of its modified release coding. So the court acknowledged that it didn't have to be a perfect layer. And secondly, in their brief, they used the word perfect. They put it in quotes. And today, Mr. Conde used the word perfect. Dr. Buck, the Mylan's expert, never ever used the word perfect to describe the stabilizing code. He never said that. What he testified to is that it had to be coherent. It had to be a layer, which is exactly what the court said it needed to be. He said that if it had significant gaps in it, it would fail. That's not saying it's a perfect layer. So this whole thing about he testified that it had to be a perfect layer and the judge relied on it, it's just wrong. It's just not supported by the record. Briefly to Judge Dyke's point about Dr. Elder, if you look at A3437 and 38, Dr. Elder in great detail explained why he did not believe that Dr. Davies' test could demonstrate there was a stabilizing code in the Mylan and in the product, and he didn't mince words. He said that it won't tell you what you're looking at, it won't tell you the structure, it won't tell you anything about it. I tried to run the test. I couldn't find it. There's no way that one can rationally argue that Dr. Elder in any way supported Dr. Davies' conclusion or even the validity of his test at all. Briefly turning to the issue of exceptional case, and I heard the questions, my only comment would be it's Mylan's view that the evidence the judge relied on to find that Dr. Davies' wasn't credible, particularly the timeline. Dr. Davies' performed the standard test in November of 2010 and none of them showed a stabilizing code. He didn't rely on any of those tests. He waited four months, almost five months, until March, until a week or so before his expert report was due and came up with this humidity test. The judge specifically found that that delay and Dr. Davies' explanation for that delay was not credible, was not credible. Like MARTEC, they knew in late 2010 they didn't have a case. They should have stopped. This case should have ended then. It didn't. They went on, they made up a test, they made us go to trial, they made us incur significant attorney's fees. What's the impact of the fact that the district judge, at least at first lush, thought that there was enough to the possible basis for the expert's testimony that the district court actually granted an injunction? Well, I note this court overturned that injunction and once he actually heard the evidence he reached the complete polar opposite conclusion. But we didn't overturn it by saying that we looked at the experts and we think one expert is more viable than the other. No, that is correct. It's a process-based analysis. Yes, but just going back to MARTEC, he ran the test he was supposed to run. And why do you run those tests? Because they are the tests you're supposed to run. And they should have, at that point, come to us and said, we're dropping the case, it's over. But let me go back to where I was with your colleague and your counsel for your co-appellee. And that is that you, well, you actually put three paragraphs instead of one into your full 1985 analysis. The first paragraph was just laying out the standard and the next two paragraphs are extraordinarily short. In other words, what did you give the district court to work from for purposes of making your argument? Are you just saying, go back and look at everything you've ever done, judge, in this case, and then you figure out the basis for bad faith? The same evidence that we present to show no infringement, the standard test, the fact that Dr. Davies ran the same standard test, the delay in coming up with a committee test, that was all evidence that was put in in the infringement case. And so we didn't repeat that in our 285 section. Our view is that it spoke for itself. And it was the same evidence, the same basis that he found that there was no infringement in particular, and this is important. He found their expert was not credible. The same evidence that he used to find he wasn't credible, the judge needed to discuss that. There's one sentence in the opinion, and this court has said that if you're going to find an exceptional case or deny exceptional case, you need to give this court something that it can look at to determine whether or not that conclusion was correct. Every time a judge excludes something under Daubert or every time a judge finds that the only expert on a point is not credible that, therefore, it renders it an exceptional case? No, in this case, we think it does because the facts are very much like Mark Teckley's. He ran those tests long before he came up with this test and could have ended the case because he had the evidence he needed that there was no infringement. Thank you, Mr. Schatzer. Thank you. Mr. Conde, we gave you back your three minutes. Thank you, Your Honor, for speaking relatively brief. I just want to address a point that Mr. Schatzer just made. He said that his timeline is correct. His timeline is incorrect. If you look at page A6052 of the record, which is Dr. Davey's test table of contents, the first two entries say sample preparation microscopy. The third entry in his laboratory notebook says optical microscopy. They did the optical microscopy. It was at that time that he saw the stabilizing layer. Keep in mind that the humidity test was only done to accentuate the layer he already saw, and he accentuated the layer because he had a sand-dose bead, which he knew had deliberately applied a provenone coat and had seen that it would get darkened upon exposure to humidity. The court clearly erred in its credibility determinations in this regard because Dr. Davey's notebook shows he did optical microscopy on October 20, 2010, and he relied on that work at trial. In addition, Mr. Schatzer talked about our use of the word perfect. I think the testimony shows that Dr. Buckton was asked the question, could there be a stabilizing coat if it had any gaps, and he said if it had any gaps, he didn't believe it would be a layer. Dr. Kibbe, who was also... He didn't use the word perfect. He did not use the word perfect. Dr. Kibbe, in fact, had tested the Dorex bead, and the Dorex bead, we all agree, has a layer, a stabilizing layer, and we have the picture of the SEM picture in our brief, and it shows that the Dorex bead, which we all know has a layer, has a significant number of gaps, and Dr. Kibbe testified that even though it had gaps, even a layperson could see that it had a layer. So the fact that Dr. Buckton did an infringement analysis on the basis that the stabilizing layer could have no gaps is clearly inconsistent with Dr. Kibbe and inconsistent with the court's claim construction on that term. Let me turn you to the 285 issue before you run out of time, and I mean, the district court said that there was absolutely no evidence of bad faith, and yet it is true that in Marquette, we said that pursuing an infringement case after all evidence points to the fact of non-infringement or proffering expert testimony that is completely incredible does at least lend support for the proposition that there has been bad faith, that that is evidence that could be relied upon. So wouldn't it, I mean, if a district judge had said, well, I've weighed the evidence of bad faith, and I don't find it strong enough, that would be one thing, but here he said there was absolutely no evidence. How can you support that? Well, I think as you pointed out, as the panel has pointed out, the district court sat through the entire trial, heard all the evidence. If you read the district court's decision for both impacts and my land, he says Dr. Davies' theories are plausible, but I disagree with him. For both impacts and my land, if you have plausible theories, that more than meets the threshold of being able to go forward with your case at trial, and it's also evidence that there is no bad faith and that you did have a good faith basis for going forward. So my response to you, Judge O'Malley, is that the district court's decision itself says that our theories were plausible. He rejected those theories. We provide a reason why we think that rejection was clearly erroneous and based on speculation and conjecture, and so we still remain asking this course to reverse. I see my time is up, unless there are any other questions. Thank you, Mr. Condon. That concludes our proceedings. All rise.